**Commonwealth v. Leddington**

*Daniel M. Keane, deputy district attorney,* for Commonwealth.

*Ann P. Russavage-Faust, administrative deputy public defender* and *Christa S. Dunleavy, senior deputy public defender,* for defendant.

GOLDBERG, *J.,* August 12, 2005—This case is before the court pursuant to the Commonwealth's request that defendant, Christopher Leddington, be designated a sexually violent predator (SVP) under 42 Pa.C.S. §§9791-9799.7, commonly referred to as Megan's Law.

The issues before us are twofold. First, is whether the Commonwealth's expert may rely upon unproven allegations contained in a probable cause affidavit, or in police reports, in reaching a determination that Leddington is an SVP. The second issue is whether the Com-

monwealth has proven, by clear and convincing evidence, that Leddington meets the criteria of an SVP.

We hold that the opinions given by the Commonwealth's expert cannot be based upon unproven allegations contained in a probable cause affidavit or other police reports, because such data is inherently unreliable and, as such, it is unreasonable for that expert to premise his opinion on such information. However, even after excluding the opinions rendered by the Commonwealth's expert that were premised upon these documents, we nonetheless find that sufficient evidence exists to designate Leddington as an SVP.

## PROCEDURAL AND FACTUAL BACKGROUND

On January 7, 2002, Leddington pled guilty to a criminal information charging him with indecent assault (Count One) (18 Pa.C.S. §3126(a)(7)) and corruption of minors (Count Two) (18 Pa.C.S. §6301). The facts recited at the guilty plea hearing established that on March 5, 2000, Leddington had indecent contact with a girl who, at the time, was under the age of 13. (N.T. 1/7/02, p. 6.)

Prior to sentencing, the Commonwealth petitioned to have Leddington classified as an SVP. This request was premised upon a report prepared by Dean Dickson, a psychologist with the Sexual Offenders Assessment Board. This petition was denied at that time due to the fact that a three-judge panel of this court had ruled that Megan's Law was unconstitutional.[1]

---

1. *Commonwealth v. Bannigan,* 60 D.&C.4th 55 (Bucks Cty. 2001).

On May 6, 2002, Leddington was sentenced to one and one-half to three years incarceration for indecent assault and a consecutive term of five years probation for corruption of minors. At the sentencing hearing, Leddington acknowledged that he committed these offenses while he was participating in sexual offender's counseling that was ongoing due to a prior conviction for indecent assault. (N.T. 5/6/02, pp. 9-10.)

After Megan's Law was found to be constitutional by our Supreme Court,[2] this matter was re-listed and transferred to the undersigned for a hearing to determine whether Leddington should be classified as an SVP. We held a hearing on this issue on May 25, 2005.

Pre-hearing, Leddington filed a motion in limine seeking the exclusion of any opinions from Dickson which were based upon "unproven allegations" contained in the probable cause affidavit or other law enforcement documents. Specifically, Leddington sought to exclude any opinions based upon alleged threats made by him to the victim after the assault and allegations that, on the same night as the incident in question, he molested another young victim.[3] (Leddington's motion in limine.)

In response, the Commonwealth first represented that the probable cause affidavit had been entered into evidence at the plea hearing and thus, because Leddington had agreed to the facts set forth in the affidavit, Dickson

---

2. *Commonwealth v. Williams,* 574 Pa. 487, 832 A.2d 962 (2003).

3. Dickson referred to these facts in his report. See *Dickson Report,* p. 2. It is unclear from the record before us which unproven allegation was contained in the probable cause affidavit and which was contained in an interview conducted by law enforcement.

properly relied upon these facts in forming his opinions. (N.T. 5/25/05, pp. 9-10.)

However, the assistant district attorney's representations are not supported by the record as the probable cause affidavit was never introduced into evidence at either the January 7, 2002 plea hearing or the May 6, 2002 sentencing. Thus, there is no record of Leddington agreeing that he either threatened the victim or molested a second victim. In fact, after further inquiries by this court at the May 25, 2005 Megan's Law hearing, the assistant district attorney acknowledged that Leddington never admitted to threatening the victim and that these allegations were never charged. The assistant district attorney also acknowledged that the multiple victim allegation was never raised at the plea hearing.

Thus, despite the complete lack of factual support at any proceeding establishing that Leddington threatened the victim or molested a second victim, the Commonwealth asserts that it was permissible for Dickson to consider these allegations through his review of the probable cause affidavit and/or other police reports. (N.T. 5/25/05, pp. 17-19; Commonwealth's memorandum of law, pp. 2-4.)

We held Leddington's motion in limine under advisement and address it below.

Only one witness, Dean Dickson,[4] testified at the Megan's Law hearing. Dickson's report was also entered

---

4. Dickson has been a licensed psychologist for 15 years, specializing in the assessment and treatment of sexual offenders. Dickson has extensive training in this area and has been a member of the Pennsylvania Sexual Offenders Assessment Board since 1996, having con-

into evidence.[5] (N.T. 5/25/05, exhibit C-1.) Dickson opined that Leddington qualified as an SVP and, in explaining the basis for his opinion, he tracked the *assessments* section of Megan's Law as follows:

*Section 9795.4(1)—Facts of the Offense*

Two of the assessment factors under this section which Dickson relied upon were the subject of Leddington's motion in limine, discussed above. As to the first, Dickson relied upon the probable cause affidavit in finding that Leddington displayed unusual cruelty during the commission of the crime by allegedly threatening the victim after assaulting her. (N.T. 5/25/05, pp. 46-47.) He also premised his opinion, in part, on the fact that there were multiple victims, again apparently relying upon police reports or the probable cause affidavit in finding that Leddington, on the same night, inappropriately touched a young girl in addition to the victim. (N.T. 5/25/05, p. 37.) For the reasons set forth below, we will not consider these opinions.

Additionally, regarding the assessment factors that pertain to the relationship of the individual to the victim, Dickson opined that Leddington used his relationship with the victim's father to gain access to a birthday party for the victim, who at the time was 10 years old. Dickson explained that during and after this party, Leddington

---

ducted approximately 500 assessments. We found Dickson's background to be impressive and his testimony credible.

5. The Commonwealth chose not to introduce into evidence any of the documents reviewed and relied upon by Dickson in reaching his conclusions.

cultivated a relationship with the victim which allowed him to sleep at the victim's house and, in fact, on the same couch with her, all for the purpose of victimization. (N.T. 5/25/05, pp. 45-46, 67-70.) (These facts were also pertinent to Dickson's opinion as it relates to whether Leddington acted in a "predatory" fashion by promoting a relationship with the victim for the primary purpose of victimization, also discussed below.)

In reaching his opinion that Leddington was an SVP, Dickson also relied upon the victim's young age (10 years old) and the fact that Leddington had previously molested his 8-year-old cousin. Dickson explained that these facts reflected that Leddington has an "age preference" for young victims, making it likely that he will re-offend. (N.T. 5/25/05, pp. 39, 46.)

### Section 9795.4(2)—Prior Offense History

This section of the assessment factors weighed most heavily in Dickson's opinion that Leddington should be classified as an SVP. Dickson opined that Leddington's prior conviction, occurring in 1998, for the same crimes as the instant offense (indecent assault and corruption of minors) indicated that Leddington has strong recidivist tendencies. The 1998 incident also involved the molestation of a young girl that began when the girl was 8 years old and continued until she was 11. (N.T. 5/25/05, pp. 39-40.) Dickson stressed that accepted research reflects that a record of prior sex offenses is highly correlated with the potential to re-offend. (N.T. 5/25/05, p. 48.) These opinions were unrefuted.

The current incident also occurred while Leddington was on both probation for the prior sex offense and in sex offender treatment. Dickson opined that these were compelling indicators that Leddington was at a high risk to re-offend. Dickson stated:

"It's significant because, during the time that he was under the supervision of Bucks County Adult Probation and Parole and in a treatment program that was approved by Bucks County Adult Probation and Parole, he re-offended when he's under supervision. I think that's significant because it means that his controls were so poor that he did not—that he wasn't affected by being under supervision. . . .

"He said: 'When I did this, I was attending classes. I was attending classes.' And this goes to this part of the statute because again, your honor, we're going back to the statistics. Hansen and Bussiere found that failed sex offender treatment is highly correlated with re-offense potential. Again, Miss Dunleavy objected, but the fact is that he didn't learn, in my opinion, within a reasonable degree of professional certainty. He didn't learn." (N.T. 5/25/05, pp. 51-56.)

As the fact-finder, we place great weight on Dickson's opinion that persons like Leddington, who fail in sex offender treatment programs, are at high risk to re-offend. (N.T. 5/25/05, pp. 49-53.)

Dickson also considered that Leddington, as a convicted child molester, under the supervision of the court and in counseling, did not recognize the high risk situation he placed himself in by attending a party with young

girls and then sleeping on the same couch as the 10-year-old victim. Dickson opined that these facts reflect Leddington's inability to control his mental illness and his unawareness of high risk situations, both of which are strong indicators of re-offending. (N.T. 5/25/05, pp. 51-54.)

Dickson also considered Leddington's prior criminal record, which included two juvenile adjudications for theft, adult convictions for burglary and theft, the indecent assault charge referred to above and various parole and probation violations. Dickson opined that Leddington's non-sexual criminal record, when viewed in conjunction with the prior sexual assault, "coalesced" to create a high risk of re-offense. (N.T. 5/25/05, p. 49, exhibit C-1.)

In summary, Dickson placed heavy emphasis on Leddington's prior history, finding that all assessment factors under this section, section 9795.4(b)(2)(i)-(iii), reflect a likelihood to re-offend.

### Section 9795.4(b)(3)—Characteristics of the Individual

In reference to the assessment factor pertaining to mental illness or mental abnormality, Dickson opined that Leddington is a pedophile as evidenced by his admitted molestation of at least two young girls. According to Dickson, this type of mental abnormality has no cure. In addition, Dickson opined that Leddington also suffered from anti-social personality disorder and impulse control disorder. (N.T. 5/25/05, pp. 63-65.)

Dickson also stated that Leddington's age when he committed the offense factored into his opinion as "highly significant." This is due to the fact that reliable studies reflect that "an early onset of sex offending is highly correlated with re-offense potential." (Dickson did acknowledge that this re-offense risk factor does decrease with age.) (N.T. 5/25/05, p. 58.)[6]

## LEGAL ANALYSIS

### *Admissibility of an Expert Opinion Based Upon Unproven Hearsay Allegations*

As set forth above, Leddington seeks the exclusion of two assessment factors in Dickson's opinion that are based upon information contained in a police probable cause affidavit or other police reports. These allegations are that Leddington threatened his victim after the molestation and that he also assaulted another young girl at the same party on the same evening.

The Commonwealth concedes that neither of these allegations were ever charged. They also acknowledge that Leddington has consistently denied both allegations. The Commonwealth asserts, however, that because probable cause affidavits are the type of data that a sexual offender assessor reasonably relies upon, that Pa.R.E.

---

6. We note that there were several assessment factors that Dickson opined did not apply to Leddington (*e.g.,* section 9795.4(b)(1)(ii)— *Whether the individual exceeded the means necessary to achieve the offense.* We have considered these factors that do not apply to Leddington in reaching our decision.

703 permits Dickson to consider these unproven, uncharged facts. We disagree.

Pennsylvania Rule of Evidence 703 does permit an expert to base an opinion or inference on otherwise inadmissible evidence so long as the evidence "is of a type reasonably relied upon by experts in the particular field." Pa.R.E. 703. Thus, in accordance with the plain language of Rule 703, experts are no longer limited to basing their opinions on firsthand knowledge or on trial records. *Commonwealth v. Thomas,* 444 Pa. 436, 445, 282 A.2d 693, 698-99 (1971) (medical experts may base opinions on reports of others not in evidence). Thus, Rule 703 should be read in tandem with Rule 705, which requires disclosure (rather than admission) of the factual basis of an expert's conclusions. Pa.R.E. 705. By permitting an expert to rely on the truth of an out-of-court source, and by requiring the expert to name or disclose that source, in certain instances, Pa.R.E. 703 and 705 allow an expert to rely on hearsay. See *Gunn v. Grossman,* 748 A.2d 1235, 1242 (Pa. Super. 2000) (medical expert witness could read into record a doctor's opinion from a consultation report).

This does not, however, mean that as long as the hearsay is the type of data that experts *typically* rely upon, that all such hearsay will be permissible. *Luzerne County Flood Protection Authority v. Reilly,* 825 A.2d 779, 783 (Pa. Commw. 2003). Nor does it follow that Pennsylvania courts have interpreted Rule 703 to eliminate the requirement that an expert ground their opinion on reliable data. *Emigh v. Consolidated Rail Corp.,* 710 F. Supp. 608, 612 (W.D. Pa. 1989) (citing *Barrel of Fun Inc. v.*

*State Farm Fire & Gas Co.,* 739 F.2d 1028, 1033 (5th Cir. 1984)). Rather, the applicability of the rule permitting experts to express opinions relying on extrajudicial data depends on the circumstances of the particular case and demands the exercise, like the admission of all expert testimony, of the sound discretion of the trial court. *Primavera v. Celotex Corp.,* 415 Pa. Super. 41, 52, 608 A.2d 515, 521 (1992).

In short, Rules 703 and 705 do not permit a court to relinquish its independent responsibilities to determine if the underlying source meets the most minimum standards of reliability and trustworthiness. *Emigh,* 710 F. Supp. at 612. See also, *Commonwealth v. Berrigan,* 369 Pa. Super. 145, 174, 535 A.2d 91, 106 (1987) (en banc) (when imposing sentence, a court may not rely on unverified hearsay outside the record); *Commonwealth v. Baez,* 494 Pa. 388, 395, 431 A.2d 909, 913 (1981) (detective's written account of what a third-party witness had told him is the type of unreliable out-of-court declaration the hearsay rule was designed to exclude).

With this background in mind, we examine the Commonwealth's request that we consider portions of Dickson's opinion which are based upon a probable cause affidavit and/or law enforcement reports. Dickson's reliance on these documents entails his consideration of several layers of hearsay, contained in documents that were neither entered into evidence nor authenticated in any way, which recite a detective's account of information obtained from a witness or witnesses, who have never been subject to cross-examination.

The right to confrontation as it relates to the introduction of out-of-court statements was recently extensively discussed by the United States Supreme Court in the case of *Crawford v. Washington*, 124 S.Ct. 1354 (2004). In *Crawford*, the court ruled that testimonial hearsay is inadmissible unless the declarant is unavailable and was previously cross-examined on the statement.[7] In stressing that reliability of evidence can only be properly tested through cross-examination, the court stated that:

"Where testimonial statements are involved, we do not think the framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' . . . Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 124 S.Ct. at 1370.[8]

---

7. The court did not provide a full definition of "testimonial" but did state that, at a minimum, police interrogations would be considered testimonial. *Crawford*, 124 S.Ct. at 1374. We also recognize that *Crawford* dealt with the introduction of hearsay as substantive evidence, which is not at issue here. However, we believe the rationale of *Crawford* as it applies to the right of confrontation is applicable.

8. The Commonwealth has asserted that *Crawford* does not apply as "the statements relied upon by the Commonwealth's expert were not made in contemplation of prosecution." (Commonwealth brief, p. 7.) We are hard-pressed to understand this logic when at least one of the statements at issue was contained in a probable cause affidavit, a document used in support of arrest.

Here, neither the allegation that Leddington had threatened the victim nor that he molested a second victim on the same night were ever subjected to cross-examination. The Commonwealth could have presented these witnesses and chose not to. Nor did they call as a witness the detective who created the hearsay documents which Dickson relied upon. As such, Leddington's right of confrontation was never applied to the allegations at issue.

We are also mindful that SVP hearings are not perfunctory affairs in which the parties and the judge merely review the trial or guilty plea colloquy proceedings. Rather, they are evidence gathering mechanisms. *Commonwealth v. Sanford,* 580 Pa. 604, 608, 863 A.2d 428, 431 (2004). SVP status carries with it serious, lifelong repercussions which can put into jeopardy a person's domestic tranquility and personal relationships. *Commonwealth v. Williams,* 557 Pa. 285, 311, 733 A.2d 593, 607 (1999). Under these circumstances, we have serious concerns about whether such data is reliable and whether it was reasonable for Dickson to rely upon these unproven allegations which were not subject to cross-examination.

Although our appellate courts have not ruled on whether such evidence may be relied upon by an expert in an SVP hearing, in a concurring opinion in the case of *Commonwealth v. Krouse,* 799 A.2d 835 (Pa. Super. 2002), Superior Court Judge Bowes addressed the same issue we address here. In agreeing with the majority that the evidence to classify the defendant as an SVP was insufficient, Judge Bowes focused on the fact that the Commonwealth's expert had relied upon facts that were

never introduced into evidence and had been denied by the defendant. In writing that the determination that a defendant is an SVP cannot be based upon unproven allegations, Judge Bowes stressed that, in this context, opinions of experts cannot be premised upon unreliable hearsay, mere suspicion and conjecture. *Krouse,* 799 A.2d at 846. We agree with this logic.

As the majority opinion in *Krouse* noted, an SVP classification requires a subjective assessment of an offender's potential future dangerousness, which includes a greater risk of error than objective determinations. An SVP classification has long lasting effects on an individual's liberty, which is why the standards of proof are so high. *Krouse,* 799 A.2d at 840. As such, we hold that Dickson's opinion, based upon a probable cause affidavit or other police reports, containing several layers of hearsay, which has not been subject to any type of cross-examination, is impermissible. Accordingly, we grant Leddington's motion in limine and exclude those portions of Dickson's opinion and report that relate to alleged threats to the victim and the alleged molestation of a separate victim on the same evening.

*Classification of Leddington As a
Sexually Violent Predator*

Under Megan's Law II, an SVP is defined as "a person who has been convicted of a sexually violent offense . . . and who is determined to be a sexually violent predator under section 9795.4 . . . due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses." Men-

tal abnormality is defined as "[a] congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." Predatory is defined as "[a]n act directed at a stranger or at a person with whom a relationship has been established or promoted for the primary purpose of victimization." 42 Pa.C.S. §9792.

The determination of whether an individual should be classified as an SVP is governed by the factors set forth in section 9795.4—*Assessments.* A sexually violent predator classification may be made only after an assessment and hearing before the trial court. In order for this classification to occur, the fact-finder must find by clear and convincing evidence that the individual is a sexually violent predator. *Commonwealth v. Dengler,* 843 A.2d 1241, 1246 (Pa. Super. 2004). With these definitions and standards in mind, we review the record, tracking the assessment factors under section 9795.4.[9]

### Facts of the Offense

Although we have excluded assessment factors sections 9795.4(b)(1)(i) and (vi) (multiple victims and unusual cruelty), there were still several assessment fac-

---

9. We are cognizant of precedent requiring the trial court to include specific findings of fact regarding the assessment factors and our reasons for finding a defendant an SVP in relation to the statutory factors. See *e.g., Krouse,* 799 A.2d at 842. We incorporate our review of the assessment factors, in this opinion, as findings of fact.

tors under section 9795.4(1)—*Facts of the current offense* that Dickson properly relied upon. Specifically, Dickson focused on the relationship that Leddington cultivated with the victim (section 9795.4(b)(1)(iv))—*Relationship of the individual to the victim.* This process began through his friendship with the victim's father which enabled him to attend her 10-year-old birthday party where a group of young girls had gathered. Dickson found this factor was particularly telling especially in light of Leddington's prior conviction for indecent assault of an 8-year-old. The fact that Leddington then worked to establish enough of a relationship with the 10-year-old victim that he was actually able to sleep on the same couch as her, where he then molested her, after having been previously convicted of molesting an 8-year-old girl, weighs heavily in favor of finding that the Commonwealth has met its burden in establishing that Leddington should be classified as an SVP.

As it pertains to the assessment factor section 9795.4(b)(1)(v)—*Age of the victim,* Dickson also relied upon the fact that Leddington, through two assaults on an 8- and 10-year-old, within a short time span had developed an "age" preference. We find this to be an additional compelling factor in favor of designating Leddington as an SVP.

### Prior Offense History

We recognize that a psychological assessment which attempts to predict future conduct necessarily entails subjective judgments which are not full-proof and have

a risk of error. However the objective, unrefuted facts establish that Leddington committed this offense:

• Three years after he had molested an 8-year-old and was convicted of indecent assault and corruption of the morals of a minor;

• While on probation and under the supervision of this court; and

• While he was in sexual offender counseling.

We find that these facts satisfy all of the assessment factors under section 9795.4(b)(2).

As set forth above, Dickson's opinion that Leddington was likely to re-offend is supported by studies which reflect that a prior sex offense is highly correlated with the potential to re-offend. The fact that Leddington committed this offense while under court supervision for a prior offense is also a great predictor of future conduct and casts a bright light on his inability to control his impulses. Further, Dickson explained that persons like Leddington, who fail in sex offender treatment programs, are at a high risk to re-offend.

Dickson also opined that the combination of Leddington's prior sexual offense and his prior, non- sexual offense record, when viewed together are also strong indicators of a person who is likely to re-offend. This factor also weighs in favor of an SVP designation.

Leddington has already proven that court supervision and psychological counseling will not deter him from re-offending. If history is the best indicator of what the future holds, then an SVP classification is warranted.

*Characteristics of Individual*

As set forth above, Leddington was diagnosed as a pedophile. This diagnosis is strongly supported by his admitted molestation of at least two young girls. We place great weight on the fact that the uncontradicted record before us suggests that this type of mental illness has no cure.

The salient inquiry in determining SVP status is the identification of the impetus behind the commission of the offense; that is, whether it proceeds from a mental defect/personality disorder or another motivating factor. *Commonwealth v. Plucinski,* 868 A.2d 20, 26 (Pa. Super. 2005); *Commonwealth v. Bey,* 841 A.2d 562, 566 (Pa. Super. 2004). When Leddington, a prior offender with an indecent assault conviction, while on probation and in counseling, places himself at a 10-year-old's party and sleeps on the same couch as the young victim, we can only conclude that the "impetus behind the commission of the offense" is derivative of a mental disorder. Leddington's unrefuted status as a pedophile, a diagnosis supported by both expert testimony and his recidivist history, is compelling evidence in the Commonwealth's favor. *Bey,* 841 A.2d at 566 (mental disabilities must be weighed more heavily than other factors which carry less significance).

Finally, Dickson considered whether Leddington's behavior was "predatory" as defined under the Act. As noted above, Dickson found that Leddington, through the promotion of his relationship with the victim's family, allowed himself to attend a birthday party with young girls. He then established a relationship with the victim which allowed him to actually share a couch with her

while they slept, where he then molested her. Given these facts, we credit Dickson's opinion that Leddington's acts were directed to establish a relationship for the primary purpose of victimization.

### Classification of Leddington As an SVP

We note that several recent Superior Court cases have reversed the trial court's determination that a defendant qualified as an SVP. However, several assessment factors not present in those cases exist here.

For instance, in *Krouse,* 799 A.2d at 842, the court found that the Commonwealth had not met its burden, in part, because it was Krouse's first sexual offense, his prior criminal history entailed only a minor offense and there were no prior incidents involving deviant sexual behavior. Here, Leddington's prior conviction for an almost identical offense, his extensive criminal record which includes a felony, and his unrefuted mental disorder are much stronger indicators than the facts in *Krouse;* see also, *Plucinski,* 868 A.2d at 27 (evidence insufficient where it was defendant's first offense and he had no history of failed treatment).

In considering all of the assessment factors, Dickson's exemplary credentials and unrefuted opinion that Leddington is likely to re-offend, and placing great emphasis on the assessment factors set forth in section 9795.4(b)(2)(i)-(iii)—*Prior offense history,* all of which have been satisfied by clear and convincing evidence, we find that the Commonwealth has met its burden of establishing that Leddington should be classified as a sexually violent predator.

Our order follows.

## AMENDED ORDER

And now, August 12, 2005, after a hearing on the Commonwealth's request to designate Christopher Leddington as a sexually violent predator, pursuant to 42 Pa.C.S. §9795.2, and upon consideration of Leddington's motion in limine, it is hereby ordered that:

• Leddington's motion in limine is granted and the opinions of the Commonwealth's expert pertaining to allegations of threats and an assault of a second victim are stricken;

• The Commonwealth has proven by clear and convincing evidence that Christopher Leddington is a sexually violent predator.

Further, Christopher Leddington is hereby advised of, and put on notice of all verification registration and compliance requirements set out in 42 Pa.C.S. §9795.3, a copy of which is attached to this order.

Counsel for Christopher Leddington shall review and explain the contents and meaning of each paragraph of section 9795.3 to him, and within 10 days of the date of this order, send notification to the court and the Bucks County District Attorney's office that this order has been complied with. Further, pursuant to 42 Pa.C.S. §9795.3(6), Leddington must also provide a written verification to the court and District Attorney's office acknowledging that his responsibilities under 42 Pa.C.S. §§9795.1, 9795.2, 9795.3, 9796, and 9799.4 have been explained to him.